# EXHIBIT A

Case 1:21-cv-07038-JMF   Document 1-1   Filed 08/20/21   Page 2 of 40

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

BRIAN ABELSON,

                                        Plaintiff,

            — against —

CITY OF NEW YORK, CHRISTOPHER
NELSON, KEVIN HERRERA, THOMAS
MOSHER,

                                        Defendants.

Index No. _____

<u>SUMMONS</u>

JURY TRIAL DEMANDED

            To the above-named Defendants: You are hereby summoned to answer the complaint in this action, and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiff's attorney within twenty days after the service of this summons, exclusive of the day of service, where service is made by delivery upon you personally within the state, or, within 30 days after completion of service where service is made in any other manner.  In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.  The basis of venue is the location where the claims arose.

TO:

THE CITY OF NEW YORK
New York City Law Department
100 Church Street New York,
New York 10007

KEVIN HERRERA
67TH PRECINCT
2820 Snyder Ave
Brooklyn, NY 11226

CHRISTOPHER NELSON
PATROL BUREAU BRONX
450 Cross Bronx Expressway
Bronx, NY 10457

THOMAS MOSHER
STRATEGIC RESPONSE GROUP 2
1278 Sedgwick Ave
Bronx, NY 10452

Dated: New York, New York
July 15, 2021

WERTHEIMER LLC

By:_____
Joel A. Wertheimer
14 Wall Street, Suite 1603
New York, New York 10005
(646) 720-1098
joel@joelwertheimer.com

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX

---

BRIAN ABELSON,

                   Plaintiff,

     — against —

CITY OF NEW YORK, CHRISTOPHER
NELSON, KEVIN HERRERA, THOMAS
MOSHER,

                   Defendants.

---

Index No. _____

<u>COMPLAINT</u>

JURY TRIAL DEMANDED

## **PRELIMINARY STATEMENT**

1.      Plaintiff Brian Abelson attended a June 4, 2020 protest in Mott Haven in the Bronx, New York (the "Mott Haven Protest"). The protest was one of a number in response to the killing of George Floyd, which sparked a wave of protest across the country.

2.      In an effort to instill fear and chill the speech of the protestors like Mr. Abelson, the New York Police Department repeatedly corralled and kettled protestors into spaces where they could not escape. The Mott Haven Protest was the most egregious and severe kettling.

3.      The NYPD beat protestors with batons, sprayed them with pepper spray, and arrested them without lawful justification, all without fair warning. Mr. Abelson was among the protestors beaten, pepper sprayed, anda arrested without justification.

4.      Protestors were subjected lengthy and unnecessary arrest

3

Case 1:21-cv-07038-JMF   Document 1-1   Filed 08/20/21   Page 5 of 40

processing, at the height of the COVID-19 pandemic. Mr. Abelson was among those

protestors subjected to lengthy and unnecessary arrest.

5.      In contrast, the same police department has responded to other

protests, including anti-COVID restriction protests and "Blue Lives Matter" protests

with virtually no arrests or physical violence.

6.      NYPD members receive insufficient training related to policing and

use of force in connection with First Amendment assemblies, because the core training

treats protest activities as forms of civil unrest, like riots, and focuses on disrupting and

demoralizing protests rather than encouraging and facilitating them, unless the

Department's leadership agrees with the message of the protest.

7.      The NYPD's violent assaults at the Mott Haven Protest exemplified

the worst of the NYPD's unconstitutional protest policing tactics and insufficient

training.

8.      NYPD members held protesters, as well as bystanders, observers,

and medics, in place performatively giving the trapped protesters "dispersal orders"

that they could not comply with.

9.      Mr. Abelson was among the protestors trapped and told to disperse

when he was pinned in by NYPD officers.

10.     NYPD members then attacked protestors, climbing on cars,

swinging batons, spraying pepper spray, and arresting anyone and everyone, without

regard to probable cause, let alone individualized probable cause.

11.     Brian Abelson was one of those people arrested, beaten, and

4

pepper sprayed without regard to probable cause.

12.     Police Commissioner Dermot Shea described the NYPD's conduct in attacking the Mott Haven protest as "executed nearly flawlessly."

### PARTIES

13.     Plaintiff Brian Abelson is a resident of Brooklyn, New York.

14.     Defendant City of New York is a municipal corporation in the State of New York.

15.     Defendant Kevin Herrera is an officer in the New York City Police Department with the shield number 12928, acting under color of state law.

16.     Defendant Christopher Nelson is an officer in the New York City Police Department, acting under color of state law.

17.     Defendant Thomas Mosher, Shield No. 2905, is an officer in the New York City Police Department, acting under color of ltate law.

### JURISDICTION

18.     This Court has jurisdiction over this action pursuant to general jurisdiction under the New York State Constitution.

### VENUE

19.     Venue is proper under CPLR § 503(a) because a substantial part of the events giving rise to the claim occurred in Bronx County, New York.

### FACTS

20.     On May 28, 2020, days after George Floyd's death, protests began across New York City. One protest in Union Square saw a mobilization of hundreds of

5

NYPD officers in response who made several arrests. A group of protestors marched to City Hall where officers kettled them with bicycles, and arrested approximately 75 people.

21.     Protests continued on May 29th at Foley Square and Barclays Center. At Barclay's Center, NYPD officers peppered sprayed and struck protesters with batons.

22.     On June 1, 2020, in the midst of the protests in New York City, Governor Andrew Cuomo and Defendant de Blasio announced that New York City would be subject to an 11:00 p.m. to 5:00 a.m. curfew.

23.     On the evening of June 1, 2020, Defendant de Blasio announced he would be extending the curfew to the evening of June 2, 2020.

24.     On June 2, 2020, Defendant de Blasio issued Emergency Executive Order No. 119, ordering "a City-wide curfew to be in effect each day from 8:00 p.m. until 5:00 a.m., beginning at 8:00 p.m. on June 3, 2020 and ending at 5:00 a.m. on June 8, 2020" during which "no persons or vehicles" could "be in public."

25.     Under the Curfew Orders: "Failure to comply with this Order shall result in orders to disperse, and any person who knowingly violates the provisions in this Order shall be guilty of a Class B misdemeanor."

26.     Pursuant to the Curfew Orders, "any person who knowingly violate[d] the provisions in th[e] Order[s] [was] guilty of a Class B misdemeanor" under NYC Administrative Code § 3-108.

27.     NYC Administrative Code § 3-108 contains a knowing intent requirement: "Any knowing violation of a provision of any emergency measure established pursuant to this chapter shall be a class B misdemeanor punishable by a fine of not more than five hundred dollars, or by imprisonment for not more than three months, or both."

28.     Under New York Penal Law § 15.05, "A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists."

29.     On June 1st, the NYPD Operations Division issued a FINEST message regarding the curfew orders, instructing officers that "[e]nforcement will only be taken after *several* warnings are issued *and* the violator is refusing to comply." (emphasis added).

30.     On June 3rd, another FINEST message omitted the instruction to issue a dispersal order prior to curfew enforcement stating that, for a "person violating the curfew, a C-summons may be issued . . . for violating the Mayoral emergency order."

31.     On June 4th, protests continued across the City, and, in a marked escalation, police made more arrests than the day before.

32.     In an attack on action against, among other things, police misconduct in the Bronx, police in the Mott Haven neighborhood blocked all exits of a protest group on 136th Street *before* 8:00 p.m., prevented protesters from leaving, and then effectuated mass arrests with heavy use of force for purported violations of the

Curfew Orders when the time passed 8:00 p.m., including striking protesters with batons, deploying pepper spray, and arresting National Lawyers Guild – New York City Chapter Legal Observers, and medical volunteers along with them.

33. At some time before 8:00 p.m., NYPD Strategic Response Group officers wearing dark padding or body armor and bicycle helmets formed a line with their bodies and NYPD bicycles at 135th Street and Willis Avenue, causing protesters proceeding south on Willis Avenue to turn east onto 136th Street.

34. At or around the same time, NYPD officers John and Jane Does 1-20 formed a police blockade ahead of, and downhill from, the protesters on 136th Street and Brook Avenue (the "Brook Avenue Line." As protesters arrived on the 136th Street block between Brown Place (on the west) and Brook Avenue (on the east, downhill), they encountered the Brook Avenue Line.

35. At or around the same time as protesters encountered the Brook Avenue Line, NYPD Officers John and Jane Does 21-40 (the "Brown Place Does") formed a second police blockade on 136th Street and Brown Place (the "Brown Place Line").

36. Also, at or around the same time, a third group of NYPD Officers John and Jane Does 41-60 (the "Sidewalk Line Does") formed a third police blockade between the 136th Street roadway and the sidewalks to the north and south of 136th Street (the "Sidewalk Lines"), effectively preventing people trapped on the roadway between the Brook Avenue Line and the Brown Place Line from going onto the sidewalk, and people trapped on the sidewalk from entering the roadway.

8

37.     The Brook Avenue Line Does, Brown Place Does, and Sidewalk Line Does formed a police trap or "kettle" from which protesters, including Plaintiff.

38.     NYPD officers failed to issue sufficient dispersal orders allowing for compliance in advance of enforcement.

**39.**     Other attendees of the June 4, 2020 march in Mott Haven have filed multiple complaints in the United States District Court for the Southern District of New York.

**NYPD's Permissive Response to Pro-Police and Other, Similar Demonstrations**

40.     The NYPD's violent response to protests against police brutality was dramatically different from their response to other kinds of protests and rallies in the summer and fall of 2020.

41.     For example, on July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter protestors against police brutality, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.

42.     On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge, Brooklyn. The march was attended by counter protestors organized against police brutality. Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both Black men protesting police

brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.

43.     In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.

### Reports and Investigations into the 2020 Protests

44.     In July 2020, the New York State Office of the Attorney General (the "AG") issued a preliminary report on the NYPD's response to the May and June protests ("AG Report").

45.     The AG Report also found the pervasive use and misuse of tightly fastened flex- cuffs during arrests, NYPD officers covering their badge numbers, and failure of NYPD officers to wear protective face coverings to protect themselves and others against the spread of COVID-19.

46.     In December of 2020, the NYC Department of Investigation also issued a report examining the NYPD's conduct in response to the protests ("DOI Report").

47.     The DOI Report found, *inter alia*, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd

control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.

48.     In addition to the heavy-handed response by the SRG at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests."

49.     The DOI found that NYPD policies do not have specific First Amendment protest expression policing policies and failed to distinguish policies for serious civil disorders and riots from those applicable to First Amendment expression.

50.     The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

51.     The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed the latter during the 2020 protests.

52.     In September of 2020, Human Rights Watch issued a detailed analysis of the Mott Haven protest ("HRW Report") describing the preplanned and coordinated disruption of the march by the NYPD, including by Chief Monahan who was present at the NYPD mobilization.

53.     The HRW Report describes the systematic "kettling" of protesters in Mott Haven before the 8:00 p.m. curfew and the subsequent excessive force and mass arrest of the marchers, including National Lawyers Guild – New York City Chapter Legal Observers, as well as medics, all of whom were classified as essential workers exempt from the Mayor's Curfew Orders.

11

54.     Following the Mott Haven Protest, Commissioner Dermot Shea said the mobilization by the NYPD in Mott Haven was "executed nearly flawlessly."

55.     The NYPD sought to justify their Mott Haven mobilization, citing purported intelligence about criminality which was identified as unrelated to the march and significantly distanced from the march.

56.     The NYPD's claims were almost immediately debunked – including, for example, in a June 8, 2020 *New York Post* article by Craig McCarthy entitled "NYPD Commissioner ignores his own 'misinformation' warnings."

57.     Relatedly, the DOI found that "the force required to carry out a mass arrest was disproportionate to the identified threat, placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."

58.     The DOI Report, AG Report, and HRW Report, in addition to the lawsuits filed following the 2020 protests, document the NYPD's persisting policy and practice of violently suppressing First Amendment expression using excessive force and mass arrests.

59.     NYPD leadership and policymakers knew the department and its officers had problems with constitutionally policing protests, but failed to adequately prepare its officers to respond to the 2020 protests, prevent its officers from committing the same acts of misconduct, or discipline officers who engaged in such misconduct.

60.     Numerous lawsuits arising out of the 2020 arrests have challenged the NYPD's misconduct, including, *Payne* et al. *v. de Blasio* et al. No. 20-cv-08924

(S.D.N.Y.), *Gelbard et al. v. City of New York et al.*, 20-cv-3163 (E.D.N.Y.), *Sierra et al. v. City of New York et al.*, 20-cv 10291 (S.D.N.Y.), *Jeffrey v. City of New York et al.*, 20-cv-2843 (NGG) (RML), (E.D.N.Y.), and *People of the State of New York v. City of New York et al.*, 21-cv-0322, (S.D.N.Y.), among others.

**Mr. Abelson is Arrested and Beaten**

61.     On the night of June 4, 2020, Mr. Abelson participated in Mott Haven. Protest

62.     Mr. Abelson wore a protective face covering to protect himself and others from the spread of COVID-19.

63.     Before 8:00 p.m., Mr. Abelson was caught in the Mott Haven Kettle on 136th Street between Brown Place and Brook Avenue, when the Brook Avenue Line formed a barricade with their bicycles to prevent passage to Brook Avenue and began pushing the crowd back with their bicycles at the same time the Brown Place Line began pushing the crowd forward from the rear.

64.     Officers in the Brook Avenue Line told Mr. Abelson and others in the front of the march to move back, but there was no room or ability for them to do so due to the pressing forward by the Brown Place Line.

65.     Officers started telling Mr. Abelson and others in the crowd at the front of the Brook line that they "couldn't breathe," mocking George Floyd's dying words.

66.     Mr. Abelson and others in the crowd then started to chant "we can't breathe."

13

67.     Unprovoked, three officers, the three named Defendants began attacking Mr. Abelson.

68.     First, Defendant Mosher punched Mr. Abelson in the right eye.

69.     One of the other two Defendant officers, then reached down and grabbed Mr. Abelson's finger and twisted it, breaking the finger and permanently damaging it.

70.     One of the three officers then pulled down Mr. Abelson's mask, which he was wearing due to the pandemic, and was then pepper-sprayed by the officers.

71.     Mr. Abelson was then pulled up over the barrier of bikes established on the Brook Avenue line, thrown to the ground, hit with batons, kicked, and then placed on his chest on the ground.

72.     Mr. Abelson's hands were then put behind his back and then an officer kneeled on his neck.

73.     The officer continued to kneel on his neck until another officer told him to stop.

74.     Mr. Abelson's arrest was even captured on camera by a local photographer:



75.     Mr. Abelson was then handcuffed with zip ties and walked to a bus where he sat with other arrestees.

76.     Mr. Abelson repeatedly requested medical attention, for his eyes and his finger, which he did not receive.

77.     Mr. Abelson sat on the bus for hours before being taken to Queens Central Booking.

78.     When he finally arrived at the arrest processing center in Queens, Mr. Abelson was forced to wait in line outside for over 45 minutes.

79.     Mr. Abelson lost sensation in his fingers from the zip ties.

80.     At approximately 1:00 p.m. on June 5, 2020, Mr. Abelson was issued a summons for unlawful assembly and released from custody.

81.     Mr. Abelson had suffered a scratched cornea and a broken finger from the events and had to see an ophthalmologist for the cornea.

82.     Mr. Abelson also suffered significant emotional injuries from the assault.

83.     The trauma of the assaults caused Mr. Abelson to suffer psychosis. He began to exhibit symptoms of mania and PTSD directly after the assault and arrest.

84.     He began acting impulsively and erratically to such a degree that his then-girlfriend and mother called NYC Well to have officers come to see him.

85.     Mr. Abelson was hospitalized at Woodhull Hospital in New York for five days against his will as a result of the incident.

86.     Mr. Abelson's relationship with his then girlfriend ended as a result of the damage done by the erratic behavior that resulted from the incident.

87.     He was administered tranquilizers at Woodhull.

88.     He was placed on significant anti-psychotics for an extended period after the incident.

89.     He continues to attend therapy.

### The NYPD's Historical Policy and Practice of Violently Disrupting Protected First Amendment Activity

90.     The extensive deprivation of constitutional rights during the 2020 protests is directly attributable to the City's disregard of many years of notice, criticism, and other relevant data points, both internal and external, related to its unconstitutional policing of similar protests over the past twenty years, at protests including those against the World Economic Forum (the "WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS")

16

protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

91.    The NYPD response to the protests in New York City in May and June 2020 was in line with its history of violent and unconstitutional responses to those as other past protests in New York City, including its treatment of First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

92.    For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, use of pepper spray and batons strikes to disperse, and "kettling" to move protestors from specific locations to effectuate mass arrests.

93.    The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of excessive force and mass arrests.

94.    The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.

95.    Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Laywers Guild – New York City Chapter Legal Observers, as well as "kettling" tactics to move protestors or initiate mass arrests.

96.     Additionally, the NYPD have employed the same tactics and practices against Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

97.     Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, kettled, arrested, subjected to mass arrests and violations of their First Amendment and other, related rights, much in the same manner as have the Plaintiff in this case.

98.     Indeed, in Plaintiff's case, the NYPD employed tactics developed and modified over the course of many years by the NYPD and by other defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

> a.     *Mandal v. City of New York.,* 02 Civ. 1234 (WHP)(FM) (S.D.N.Y.) and related cases challenging NYPD's written and unwritten policies and practices enacted after the police shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a result of these policies, the NYPD began detaining and fully processing people arrested for non-criminal violations who were otherwise eligible to be processed and released with Desk Appearance Tickets ("DATs"). *See, e.g., "Mandal I,"* No. 02 Civ. 1234 (WHP), 02 Civ. 1367 (WHP), 02 Civ. 6537 (WHP), 2006 WL 2950235, at *4-7 (S.D.N.Y. Oct. 17, 2006) (denying summary judgment on plaintiffs' Fourteenth Amendment Equal Protection and First Amendment- based claims that the policies "constituted facial violations of [plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations"); *Mandal v. City of New York* ("*Mandal II*"), No. 02 Civ. 1234 (WHP), 02 Civ. 1367 (WHP), 2007 WL 3376897, at *2 (S.D.N.Y. Nov. 13, 2007) ("*Mandal II*") (noting that approximately 38 *Mandal* plaintiffs prevailed at trial on claims that "the City had an

18

unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

b.    *Burley v. City of New York*, 03 Civ. 2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy offa detaining perceived protesters who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them for consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as "unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

c.    *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including Defendant Monahan, arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

d.    *Haus v. City of New York,* 03 Civ. 4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al.*, 04 Civ. 0665 (RWS) (S.D.N.Y.);

e.    *Kunstler v. City of New York*, 04 Civ. 1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as encircling protesters, striking them with nightsticks, and using extremely tight plastic handcuffs in their arrest. Defendant City of New York settled this litigation with payment in excess of $2,000,000;

f.      *MacNamara v. City of New York*, 04 Civ. 9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05 Civ. 8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04 Civ. 7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04 Civ. 7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz*, 06 Civ. 2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04 Civ. 7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor theinfraction, rather than issuing summonses on the street"); *MacNamara v. City of New York*, 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrestsubclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04 Civ. 7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (grating plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

g.      *Callaghan v. City of New York*, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading *Monell* claims virtually identical to the core *Monell* claims pleaded herein));

h.      *Osterhoudt v. City of New York, et al.*, No. 10 Civ. 3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendants' motion to dismiss *Monell* claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of

arresting political demonstrators without determining probable cause on an individual basis");

i.      Despite (then-Mayor Michael Bloomberg's recognition that, "the majority of the [OWS] protesters have been peaceful and responsible,"25 there were more than sixty civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14 Civ. 5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listed by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco,* 15-cv-7280 (S.D.N.Y.);

j.      Others have continued through discovery and are awaiting trial, including two cases involving failure to train claims similar to those at issue in this case, which are currently scheduled for trial: *Packard* v. *City of New York* 15-cv-7130 (S.D.N.Y.) (AT); *(Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT);

k.      The Plaintiffs in *Case, et al. v. City of New York, et al.*, 14 Civ. 9148 (AT)(BCM) were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including *Monell* claims with much in common with many of those raised herein. *See Case v City of NY*, 233 F Supp 3d 372 (SDNY 2017) ("*Case I*"); 408 F.Supp.3d 313 (SDNY 2019) ("*Case II*");

l.      Those cases, and several of the OWS-related cases referred to above, included failure to train *Monell* claims concerning protest activity that are similar to the *Monell* claims in this litigation;

m.      *Peat v. City of New York,* No. 12 Civ. 08230 (S.D.N.Y.), fifteen OWS plaintiffs arrested on January 1, 2012, on the sidewalk in the East Village settled a case with Defendant City of New York for $598,000. The settled complaint alleged that plaintiffs were peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk, encircled them on three sides sufficient time or a path of egress as members of the scooter task force blocked the protesters path of egress;

n.      The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner

Center for International Law and Justice at Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

o.    *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.*, First Amended Complaint at Paragraph 415).

### The NYPD's Failure to Train

99.    Since at least the 1990's, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies.

100.    In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

101.    In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

102.    Upon information and belief, to this day, that document forms the core of today's NYPD protest response-related training.

103.    The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, such as disorder control formations and making mass arrests.

104.    Upon information and belief, Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

105. However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

106. For example, upon information and belief, there is virtually no NYPD training— and certainly no *meaningful* NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like. Although the above, and related, problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

107. The SRG, deployed around the City at protests in 2020 including those that are the subject of this lawsuit, was created in 2015 as a specialized unit tasked with responding to disorder- causing events and to conduct counter-terrorism operations.

108. The SRG has a unit in each of the five boroughs and the Disorder Control Unit has now been incorporated into the SRG.

23

109.    In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling protests and demonstrations. They'll have no role in protests.  Their response is single-fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city."

110.    However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the present lawsuit.

111.    Many SRG members, including many of those deployed to the protests in 2020 that are the subject of this lawsuit, have histories of engaging in the kinds of misconduct complained of herein, among other places, by CCRB complaints, and in numerous lawsuits.

112.    SRG members are meant to have additional DCU training.

113.    Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

114.    However, many of the officers deployed to respond to the protests in 2020, did not even receive *that* training, which was supposedly required of them.

115.    As a result, as a report by the Corporation Counsel for the City of New York ("OCC Report") noted, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received as recruits in the Academy."

24

116.    Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with crowd control while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies, as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

117.    Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors - including DCU supervisors charged with designing and implementing NYPD protest policing-related policies and related training – routinely created "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

118.    For example, in a March 17, 2006 *New York Times* article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of 2002 WEF after-action reports in then-ongoing litigation, *Allen v. City of New York*, 03 Civ. 2829 (KMW) (GWG) (SDNY).

119.    Those reports praise employing militarized tactics such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as

Case 1:21-cv-07038-JMF   Document 1-1   Filed 08/20/21   Page 27 of 40

the use of "proactive" arrests in order to have a "powerful psychological effect" on protesters.

120. After the 2002 WEF after-action reports were disclosed in *Allen* and the 2004 RNC- related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, rather than continuing to create such reports frankly documenting and assessing the NYPD's protest policing-related policies and tactics, the NYPD opted to stop creating such records.

121. For example, according to the Corporation Counsel's report, NYPD records do not show any protest-related after-action reviews undertaken between the 2004 Republican National Convention and until the events of the George Floyd protests.

122. Nevertheless, upon information and belief, at all times relevant herein, City policymakers routinely received reports regarding arrests made in connection with perceived First Amendment assemblies, including through internal reports such as Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the involved in mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

123. Despite the wealth of evidence of NYPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize,

relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing

124.   For example, in a deposition in *Packard v. City of New York,* 15-cv-7130 (S.D.N.Y.), the City of New York testified that in regards to protest police training it did not review: (i) decline to prosecute decisions, (ii) conviction conversion rates or (iii) allegations and settlements in lawsuits relating to protest.

125.   As another example, Defendant City apparently does not take allegations in lawsuits filed by protesters claiming they were falsely arrested during protests into account in considering its protest policing-related policies and training, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

126.   For example, in a 2017 deposition, Defendant City could identify no impact litigation against Defendant City between 2000 and 2011 had on Defendant City's relevant policies, practices, customs, or training.

127.   Relatedly, according to the Corporation Counsel, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."

128.   Defendant de Blasio directed the DOI and the Corporation Counsel to produce the DOI and Corporation Counsel reports referred to herein.

129.   While both City agencies made reports and recommendations that include what may be characterized as critiques of some NYPD protest-related training,

27

neither the DOI nor the Corporation Counsel, nor any other City agency, has released

the contents of that training – despite that much of its core contents are already publicly

available, including on the public docket in *Case, et al. v. City of New York, et al.*, 14 Civ.

9148 (AT)(BCM).

130.     At bottom, the NYPD's near-exclusive focus on deterring,

dispersing, and demoralizing in trainings related to policing protests, coupled with the

failure to train on specific, relevant aspects of constitutional policing of protests, let

alone how to encourage or facilitate protests - despite having received clear notice that

NYPD policing of protests has caused the systemic violations of protesters'

constitutional rights for years – demonstrates both a history, and a policy, of disregard

for the First Amendment, Fourth Amendment, Fourteenth Amendment, and other,

related rights of Plaintiff and other similarly injured protesters.

### FIRST CLAIM FOR RELIEF

**Unlawful Seizure / False Arrest**
*Pursuant to New York State Law and 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights the Fourth and Fourteenth Amendments to the United States Constitution*

131.     Plaintiff incorporates by reference the allegations set forth in all

preceding and following paragraphs as if fully set forth herein.

132.     Defendants had no judicial warrant authorizing then to seize

Plaintiff.

133.     Defendants seized Plaintiff, restricting their freedom of movement,

without privilege or lawful justification.

134.     Plaintiff was conscious of his confinements by Defendants.

28

135.    Plaintiff did not consent to his confinements by Defendants.

136.    It was unreasonable for Defendants to believe that they had lawful cause to seize, detain, or arrest Plaintiff.

137.    Thus, Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiff.

138.    Those Defendants who ordered, effected, and otherwise participated in arresting Plaintiff subjected Plaintiff to unlawful seizures, false arrests, and/or searches and/or seizures of their persons and/or property.

139.    In many cases, Defendants seized Plaintiff based on the perception that they were part of a perceived group, without having made an individualized determination that there was probable cause to arrest the Plaintiff based on his own, individual conduct, as opposed to the perceived "group conduct."

140.    Defendants failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making arrests where such notice and opportunity were required.

141.    With respect to Mayor de Blasio's Curfew Orders, the plain language of the Curfew Orders required both (a) a knowing violation of the Executive Order prior to any arrest *and* (b) that any arrest could only follow a dispersal order, a meaningful opportunity to disperse, and a person's refusal to comply with the order.

142.    Plaintiff was arrested without first ensuring that he had been given dispersal orders, meaningful opportunities to disperse, and refused to comply.

143.    That enforcement was consistent with official NYPD policy.

144.    For example, in a September 16, 2020 letter from NYPD Deputy Commissioner of Legal Matters Ernest F. Hart to Ida Sawyer, Acting Crisis and Conflict Director, Human Rights Watch35, DCLM Hart stated that officers who merely "observed individuals who were not essential workers in public…[t]hat observation provided officers with probable cause to take, at a minimum, enforcement for Administrative Code § 3-108, Violating a Mayoral Executive Order, a 'B' Misdemeanor."

145.    Additionally, in many cases, Defendants enforced other provisions of New York law against Plaintiff and other perceived protesters without probable cause and/or without first having given constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making such arrests.

146.    For example, with respect to protestors who were arrested in connection with perceived violations of P.L. § 240.20(5) (Disorderly Conduct – Blocking Pedestrian or Vehicular Traffic), Defendants failed to ensure that each such arrested Plaintiff had caused a criminally significant blockage of traffic, and/or to ensure that each such arrested Plaintiff had the state of mind required for such arrest.

147.    By way of further example, with respect to protestors who were arrested in connection with perceived violations of New York Vehicle and Traffic Law § 1156(a) (Pedestrians on Roadway), Defendants failed to ensure that each such arrested Plaintiff had notice that they were allegedly violating the law by walking along and/or upon a roadway and/or a meaningful opportunity to conform their conduct to the law in order to avoid being arrested.

30

Case 1:21-cv-07038-JMF   Document 1-1   Filed 08/20/21   Page 32 of 40

148.    In many cases, Defendants employed a crowd control tactic in
which Defendants pushed and/or corralled and/or otherwise physically trapped
perceived groups including Plaintiff and other perceived protesters, without first
having given Plaintiff and the others so pushed and/or corralled and/or trapped
meaningful notice and an opportunity to disperse or otherwise change their conduct in
order to avoid being so pushed and/or corralled and/or trapped.

149.    One version of the above-described pushing/corralling/trapping
tactic, in which police encircle or otherwise surround a perceived group, is commonly
referred to as "kettling."

150.    Beyond that, in many cases, Defendants arrested Plaintiff for
alleged offenses in connection with which New York Criminal Procedure Law § 150.20
required that Plaintiff receive a summons on the street in lieu of a fuller or lengthier
detention; and/or in connection with which, under the NYPD policies and practices
that are applied in non-protest contexts, arrestees are taken directly to a nearby local
precinct, and released in an average of between around two and four hours with a
summons.

151.    However, because Defendants arrested Plaintiff and other arrestees
in connection with a protest, Defendants subjected them to Defendants' Protest Arrest
Processing Policies, which involved, among other components, placing Plaintiff and
other arrestees in flex-cuffs and removing them from the street to a centralized arrest
processing location such as a Mass Arrest Processing Center ("MAPC"), where
Defendants subject them to large-scale arrest processing procedures and Mass Arrest

Processing Plan ("MAPP") rather than issuing them summonses, and releasing them from custody, on the street.

152.     As a result, instead of detaining Plaintiff and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants subjected Plaintiff to unreasonably long, onerous, punitive arrest processing, as well as obviously hazardous conditions of confinement given the COVID-19 pandemic.

153.     Additionally, as a result, instead of detaining Plaintiff and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, as part of Defendants' Protest Arrest Processing Policies and MAPP, Defendants subjected Plaintiff to a search without Due Process.

154.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

## SECOND CLAIM FOR RELIEF
### Excessive Force/Assault and Battery
*Under New York State Law and pursuant to 42 U.S.C. § 1983 for Defendants'*
*Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the*
*United States Constitution*

155.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

156.    Defendants used force against Plaintiff that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

157.    The types and levels of force Defendants used against Plaintiff were unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

158.    Defendants used types and levels of force against Plaintiff and other protesters that were in contravention of, or inconsistent with, related NYPD policies and/or training.

159.    The City of New York failed to investigate incidents of which they were aware or should have been aware in which NYPD members used excessive force against Plaintiff and other protesters.

160.    The City of New York failed to discipline NYPD members who used excessive force against Plaintiff and other protesters.

161.    Defendants used force against Plaintiff based on their position in or proximity to a perceived group, without first having given the perceived group clearly

33

communicated, prior notice as well as a meaningful opportunity to comply with police orders and/or dissociate with the perceived group.

162. Plaintiff and others arrested at the protests that are the subject of this litigation were handcuffed with their wrists together and their hands behind their back with plastic flex-cuffs.

163. Plaintiff and/or other arrestees complained about the fact that their flex-cuffs were too tight and/or causing them injury.

164. Specifically, because they were arrested at a protest, Plaintiff was subjected to flex-cuffing pursuant to Defendants' Protest Arrest Processing Policies, in connection with which Defendant City did not supply Defendants with an adequate numbers of cutting tools with which to loosen or remove flex-cuffs, or *any* flex-cuff pads, which are designed to prevent the very types of injuries Plaintiff and other arrestees suffered as a result of having flex-cuffs applied to them.

165. It was no secret to the City of New York that using flex-cuffs to restrain protesters – including without providing adequate numbers of cutting tools or any protective padding – would result in injuries to protesters, of the sort that appropriate policies, training, and/or supervision would have avoided.

166. For example, *Burley v. City of New York*, 03 Civ. 2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) was a class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, the NYPD's then- policy and practice of using plastic flex cuffs as "unreasonable and

excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed."

167.    By way of additional example, Plaintiffs in *Kunstler v. City of New York*, 04 Civ. 1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, also raised *Monell* claims around NYPD members' use of extremely tight, plastic handcuffs.

168.    And, as a final, further example, in *MacNamara v. City of New York*, 04 Civ. 9216 (RJS)(JCF) (S.D.N.Y.), the Court certified a "Conditions of Confinemet Class, comprising all arrestees who were handcuffed with plastic flex cuffs." *See MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011).

169.    The DOI Report found, "When voicing those concerns to their arresting officers or other officers in the area, arrestees were told that the officers lacked the necessary equipment to remove the flex-cuffs. Arrestees therefore had to wait, oftentimes for long periods, until they got to their respective arrest processing center so that flex-cuffs could be removed."

170.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

## THIRD CLAIM FOR RELIEF

**First Amendment Infringements, Including First Amendment Retaliation**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the
First and Fourteenth Amendments to the United States Constitution*

171.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

172.    Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in falsely arresting Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and regulations against Plaintiff in subjecting Plaintiff to Defendants' Protest Arrest Processing Policies, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

173.    Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

174.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

175.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff and others from engaging in similar protected conduct in the future.

176.    Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those

Defendants who implemented them subjected Plaintiff to violations of the First

Amendment rights.

177.    Defendants engaged in the acts and omissions complained of

herein with respect to Plaintiff's First Amendment-based claims – including the related

municipal liability claims involving the adoption of policies, practices, and/or customs

and/or related failures to train, supervise, and/or discipline - with malice.

178.    Defendants engaged in the acts and omissions complained of

herein with respect to Plaintiff's First Amendment retaliation claims in response to the

perceived viewpoint and/or message expressed by Plaintiff.

179.    Upon information and belief, Defendants did not subject other

protesters expressing "Blue Lives Matter" or other, similar, pro-police messages who

were similarly situated to Plaintiff in terms of their conduct and/or its potential public

ramifications to the conduct, policies, practices, and/or customs complained of herein.

180.    Additionally, the offenses charged against Plaintiff which

Defendants might argue provided probable cause for Plaintiff's arrests, were all

offenses that Defendants typically exercise their discretion not to enforce, or not to

make arrests in connection with.

181.    Plaintiff suffered actual chill in that he was prevented and/or

deterred from or impeded in participating in protected conduct on the date of and after

the incident; and/or suffered adverse effects on their protected speech and/or conduct;

and/or otherwise suffered some concrete harm(s).

## FOURTH CLAIM FOR RELIEF
### Denial of Medical care
*Pursuant to New York Civil Rights Law §28*
*Against Individual Defendants*

182.    Plaintiff hereby incorporates by reference the allegations set forth

in all preceding and following paragraphs as if fully set forth herein.

183.    Under Civil Rights Law § 28, any person who has not received

reasonable and good faith medical attention while arrested and suffers serious physical

injury or significant exacerbation of an injury or condition shall have a cause of action

against such officer, representative, and/or entity.

184.    Mr. Abelson's eye injuries were exacerbated by his failure to

receive medical care.

## FIFTH CLAIM FOR RELIEF
### Municipal Liability
*Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658
(1978) for Defendants' Violations of Plaintiff's Rights Under the First, Fourth, and
Fourteenth Amendments to the United States Constitution*

185.    Plaintiff hereby incorporates by reference the allegations set forth

in all preceding and following paragraphs as if fully set forth herein.

186.    All of the wrongful acts or omissions complained of herein were

carried out by the individual named and unnamed police officer defendants pursuant

to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and

decisions by Defendant City's policymaking agents including; (c) customs, practices,

and usage of the NYPD that are so widespread and pervasive as to constitute *de facto*

policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by

Defendant City; (d) Defendant City's deliberate indifference to Plaintiff's rights secured

by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as

evidenced by the City's failures, and the failures of the City's policymaking agents, to

train, supervise, and discipline NYPD officers, despite full knowledge of the officers'

wrongful acts, as described herein.

        PRAYER FOR RELIEF WHEREFORE, Plaintiff respectfully requests

judgment against Defendants as follows:

        1. awarding compensatory damages against the Defendants;

        2. awarding punitive damages in an amount to be determined at trial;

        4. awarding Plaintiff reasonable attorneys' fees and costs under applicable

law; and

        5. directing such other and further relief as the Court may deem just and

proper, together with attorneys' fees, interest, costs, and disbursements of this action.

Dated:  New York, New York
        July 14, 2021

        WERTHEIMER LLC

        By: _____
        Joel A. Wertheimer
        14 Wall Street, Suite 1603
        New York, New York 10005
        (646) 720-1098
        joel@joelwertheimer.com